you. Bt Council, you hurt Ms. Brand Strader. You may proceed. Thank you, Your Honor. Good morning. My name is Thomas Brand Strader. I represent the appellate petitioner in this matter, Mr. Carvalito. May it please the court. This court has said that the critical issue of this cause was the extent of Carvalito's knowledge about the presence of a gun in the car the day of the shooting. He stayed in his case, attempted to show that knowledge in two aspects. One was Mr. Carvalito's statement given in the police station in the middle of the night, the night he was arrested. The second aspect was a testimony of Detective Dempsey as to the statement that Lucy Carvalito allegedly made to him about the presence of a gun between Mr. Perez and Mr. Carvalito. We have, factually, there's a lot of questions, and we've read the briefs. That particular statement, in our first disposition, Justice Ferguson, the author, we sent the case back. It turned out that the statement was not in Dempsey's notes at all. Even though the attempted impeachment in and of itself was improper, as it turns out, the statement probably was never made, correct? Correct. But yet it was argued as substantive evidence at trial by the state. In closing argument, they argued that the defendant told his sister about the gun, correct? They did. And during this hearing, these notes finally appeared on the very last day we were there in front of Judge Levin. 30 pages. We all went through them, not a shred. Lucy Carvalito's name was there with her date of birth. Mr. Carvalito's name was there with his date of birth. Not an item, a sentence, or a line about a gun. And the representation was that these were the notes that were made by the officer after the interview? Exactly. And the state's position, as I understood it after the hearing was, well, this was just impeachment. This wasn't substantive. This wouldn't have changed anything. And Judge Levin, unfortunately, agreed with that. We don't. We believe that Mr. Lombardo would have had those notes standing in front of that jury after Dr. Dempsey said, well, she told me that they talked about going to North Chicago to get a gun. Lucy Carvalito, when called by the state, said, I never said that. Where did the state's good faith basis, they had no good faith basis for that question then? That's your position? Well, that's a very good question, Judge, because they didn't have the notes either. Dempsey said he left them in his office and didn't produce them until this third stage hearing, the very last day of it. Do we know where that question, what that question was based upon then? From the state? Yeah. During the hearing on the post-conviction petition, was there any argument by the state that they had a good faith basis for that question? They did not. They just said that we don't, we didn't have the notes either. Judge Levin said there was no bad faith in turning over the notes, and we're not going to argue about that. But the key question is, Mr. Lombardo would have had that in trial. He could have significantly impeached Detective Dempsey. The key question is, there's nothing in these notes about any gun in Lucy Carpolino. And going back to the state's argument and Judge Levin's acceptance of it was that this was just impeachment. It wouldn't have changed anything. Telling me just before Judge Levin said that, he goes, well, I don't know what effect it would have had on the trier of fact, but it was impeachment. And with all due respect to the trial court, the trier of fact being a jury, I think it stretches to say that they understand the difference between what's substantive and what's impeachment when they hear it coming from the witness stand. And if they could have heard from the defense counsel that there was nothing about any gun in Lucy Carpolino, and that Detective Dempsey had said, well, I wrote my police report that you have from these notes. In the police reports, we have a statement. In the notes, there is no statement. I believe Justice Burkett had some contributory factor towards some statute that requires police officers to turn over notes. Are you aware of that? With the Supreme Court rule, and we understand that it's not being looked at as a Brady violation, although we find it favorable. We find it was significant. Well, impeachment material is Brady material. We agree. The state in the third district, the state of the third district hearing, didn't see it that way. They argued it was a discovery violation. Maybe it could be sanctioned, but we think it was much more significant. It's not just a matter of not turning over an inventory report or a forensic evidence. This was significant impeachment. And the one witness who tried to put the gun in the car was Mr. Carpolino. Well, we, in our disposition, we refer to a statute that actually was written during the death penalty reform and prosecutorial misconduct issues that were percolating. And police officers are required to share with the state's attorney any information that might be exculpatory, even after a trial. And that didn't occur here until the last day of the third district hearing, the day of our argument. With regard to this trial strategy on proceeding on the motion to suppress, you argue that it could not have been strategy because as a matter of based upon the facts of the case, it's likely that the motion to suppress would have been successful, correct? Agreed. And after our hearing, Judge Leavitt's ruling where he said, well, Mr. Lombardo weighed all the factors. My reading of Mr. Lombardo's testimony was that he was more concerned about his client's ability to withstand the rigors of examination and cross-examination. And he was trying to prevent them from doing it twice. The problem with that idea is that he's successful with the motion, which has all the circumstances needed to reasonably argue that the statement was coerced. He wouldn't have to put his client on the trial. There would be no statement against him. There would be no reason to. Well, he also has to look at, wouldn't you agree, what's the likelihood of success on the motion? And if I'm going to prevail on a motion, I'm probably going to have to call my client. Isn't that reasonable strategy? When the key piece of evidence against your client is this statement that was taken in the middle of the night from a 17-year-old boy who now we know has some learning disabilities with a special education, never been in the custodial interrogation position before, scared, tired, kept from his family, kept from any lawyers, kept from his father. When you say kept from his family, you've cited Westmoreland, but that case is factually different, isn't it? Westmoreland? Yes. In that case, the defendant, the 17-year-old, was accused of sex offenses. He requested to see his mother twice. Here, your client never requested to see his father or mother, did he? He did not. But his father made accurate attempts to come and see him. Again, in his father's attempts, he's not aware of his father's attempts. I don't believe he was. He didn't testify. It is different than Westmoreland, correct? It is. But it's, again, we have to talk about the totality of the circumstances. We have to talk about the fact, and this court mentioned it before, they didn't have to tape record it or videotape it. The law wasn't that law yet, but there was nothing wrong with doing it. They had the ability to do it. They're talking to a person about a murder case. The wise thing to do would be to do it. Also, the absence of any authority or friend, counsel, family member other than the two detectives, one of them that our position was standing over him, yelling at him in the middle of the night that you're lying about this. Tell us. He started out telling them I didn't know the guy had a gun. A few hours later, he's saying anything the detective wants him to say. Obviously, nobody can foretell before you file a motion in an argument in court, call your witnesses, that you're going to win it. But this was the ballgame. This is the key thing. This statement from Mr. Carvalho that he knew that Perez had a gun in the car. But he explained both in the trial court and again during the third stage hearing that he discussed all these factors with his client, and he decided with his client's approval not to run the motion. He discussed it and at the same time said, to answer my questions, this statement was coerced. He said it was less than voluntary. He was worried about the malleability of this soft-spoken 17-year-old on the stand. And there can be no complaint about that. Did your client testify during the third stage hearing? He did not. Did you provide an affidavit from your client? It was one attached to his original petition. And what did that say with regard to the motion to suppress as to whether or not he agreed to it or not? It was not spoken to, whether he agreed to it or not. But does the affidavit say that he did not agree to forego the motion? I am drawing a blank on that very specific question. Isn't that important that, you know, notwithstanding your argument here, the record and the affidavit before the trial court did not say that the defendant did not agree with counsel's decision not to run the motion. Do you understand my point? Yes, I do. In People v. Williams, the Illinois Supreme Court, 36 Illinois 2nd, 194, the court discussed the strategy, respective strategy, deference to trial counsel. Applying the foregoing principles to this case, we believe that a hearing under the Post-Conviction Hearing Act on the voluntariness of the confession was properly denied. Unlike the Henry case, there is no doubt that there was a waiver by counsel and not an honest mistake in failing to request a preliminary hearing on the admissibility of the confession. His stipulation shows that he intentionally bypassed the hearing on the voluntariness of the statement because he was prepared to show that his client had not made the damaging admissions in the statement. Now, here, this is different because your client admits he made the statement, but he maintains it was coerced. And he's going to have to say, if he testifies at a post-conviction or at a motion to suppress, he's going to have to talk about the fact that he did make the statement, correct? That's correct, Judge. We relied on, first of all, to answer the first question, Mr. Carbolino did swear and veer and verify the amended petition, which brought up the failure to put out the motion to suppress based on voluntariness. We also relied on his extensive testimony at trial as to what happened. And where he did testify, he was scared, he was being yelled at in the middle of the night, he didn't talk to anybody but detectives. They would not go with what he was saying when he said he didn't have knowledge, it wasn't good enough for him. In fact, his second statement was a written statement, saying I didn't know he had a gun, that wasn't good enough for the detectives, and they kept going. Are matters of trial strategy something that a defendant-client can affect? In other words, does a client have the ability to torpedo or to overrule strategy matters? Or does the defendant only have the right to decide whether or not he's going to testify or have a jury trial, etc.? It's always his right to plead guilty or not guilty, right to testify or not, right to ask for a lesser included are all his rights, not the lawyer's. Can a defendant torpedo a defense strategy? Certainly, Judge. The lawyer could say, listen, I think we have a good shot here at getting you safely suppressed. You were coerced, you were young, you've never done this before. I never heard Mr. LaMaro say, well, Mr. Carvalho said, no, I don't want to do that. My problem, my position, when it is the key, crucial piece of evidence against you, and as we cited in the brief, and I know the courts have read this, there is nothing more damning to a prior effect than words out of the defense attorney's mouth. Assuming, arguably, there was a motion to suppress, what would the defense attorney have to do in order to open up his client to complete cross-examination on the entire case? Would he not have to ask questions indirect that would open the door for cross-examination? In other words, does the lawyer have the ability on a motion to suppress, assuming that he's going to exercise that strategy to limit direct examination of his client so as to prevent that which he claimed he didn't want his client to undergo? Well, he can certainly limit the topics on direct and cross to the detailed circumstances of how the statement was taken and arguments of coercion and involuntariness. If the court is discussing the substance of the statements themselves, our position is that would be technically objectionable. It's not about what he said, it's about how he said it and how they extracted it from him. I'm not for a second saying they're not pitfalls in putting your client on pretrial. But again, when you have these facts before you, and Mr. Lombardo admitted at the hearing he believed the statement was coerced and he believed the statement was less than voluntary. Even without the gun, let's talk about the evidence. Even without the gun, doesn't the state still have a very strong case on the common design rule that your client is responsible for the shootings? Notwithstanding that pre-knowledge of the gun? I don't disagree, Judge. If he doesn't know Perez has a gun and he thinks he's going over to have a fight and they throw gang signs at each other, I suppose, and there wasn't even much discussion about that. Nevertheless, the cases we cited where the guy has a car accident, his buddy has a gun, the guy jumped out of the car and shoots him. Those cases have all been distinguished in Fernandez. The Illinois Supreme Court has distinguished those cases in an opinion that I recently wrote on facts virtually not the same, not identical, but very close to these facts. The defendant will maintain he had no knowledge of the gun, but was the driver and facilitated the shooting by maneuvering the vehicle and waited while the shots are fired to defend. The shooter gets back in, then he takes him somewhere where the shooter has dropped off and he flees. We affirm the conviction on common design. My point is, what's the prejudice that the defendant suffered? If we eliminate his statement or if I'm remanded, there's a hearing on a motion to suppress. And if that motion could be granted, then your client would give him a trial. Even without that evidence, where's the prejudice? In light of Fernandez. I think the argument would be made that you can't help the powerful with the felonious, criminal, insane behavior of an individual that he doesn't know his arm. But he's joined with him for the purposes of a gang confrontation, which he admitted. He testified he knew they were going there to confront gangster disciples. He knew who was the gang member. And he knew they were going to go there and drive along and look for gangster disciples. Isn't that the substance of his testimony? It is. But the distinction is when you think you're going to get out and have a fist fight, it's far different than a guy getting out with a gun and shooting. Now, Fernandez said, you know, there's going to be a burglary. Somebody has a gun. You don't know about it. You're still responsible under common design. It's a different offense. It is. It is an offense notwithstanding. It's mob action. And they would have to prove common design before we get there. And I understand Fernandez is, you know, they do make a distinction between the common design and the other theories of accountability. And although the state didn't argue it in these cases in their brief, they did say in their brief that notwithstanding the gun, the evidence is still more than sufficient, overwhelming, in fact, on common design. And we would disagree with that, Judge, in that the fact that, you know, I don't know where you start the common design. He's sitting in a car with Mr. Jasso. Perez jumps in and jumps out. Let's say he takes me over to Greenleaf. Now, in his statement, Carver was thinking, well, you know, these guys have been throwing game signs back and forth. There's going to be trouble. I don't think he can, I don't think, I'd like to take a shot at least in front of a jury argument. You can't get him to murder based on accountability. On remand, if we were to reverse this case and grant your client a new trial, you're still going to be stuck with his trial testimony from the first trial. I am, Judge, and I'm ready to argue it in front of a jury. And our respectful position, Judge, is that this statement, with all the trappings of involuntary coercion that the trial counsel agreed to, that his reason for not doing it should be found to be reasonable in this situation. There's a whole sheaf of other evidence out there, eyewitnesses and forensics and everything, that may be a little different. And we believe that's not the position, and that's not the situation in this court. And he could have run the motion without even calling your client? He could have tried that. It would have been difficult, obviously, but he could have tried it. He could have had the father testify. Thank you. Do I have an opportunity to make a rebuttal? Thank you, Judge. Ms. Diaz? Good morning, Your Honors. Counsel, may it please the Court, Aileen Diaz on behalf of the people of the state of Illinois. If the Court would permit me to do so, I would like to start with the discovery violation issue. Yes, there was obviously a discovery violation, as this Court found in sending the case back after an appeal from a first-stage dismissal. The state did turn over Officer or Detective Dempsey's notes. However, we don't understand where there was a substantial constitutional violation when there was nothing material in the notes that would have added to anything that was presented at trial. Well, there was a constitutional violation as far as not turning over the notes, but we admitted at third stage that that was a discovery violation. We turned over the notes, and defendant fails to show how these notes would have been material at trial. Failed to show? Yes. He argues that the notes would have given him an opportunity to impeach Detective Dempsey. However... If I said to someone, you told me you robbed the bank yesterday, and the bank was robbed yesterday, and I said I wrote it in my notes. In fact, I made a video of it, of me writing my notes, and I testified in open court to that effect. And there was a video, and there were written notes, and the video was taking me writing my notes, and the notes didn't say anything about you, didn't say anything about a robbery. You don't think that that would be exculpatory and wouldn't impeach you beyond belief? I don't think it would be exculpatory necessarily. Well, if your testimony is the only thing that links this person to the armed robbery... Right, but there was a report. The report was... Are you going to tell me that a police officer who got a statement from a witness that this suspect knew about a gun, he doesn't put that in his notes, but all of a sudden, out of the blue, he remembers to put it in his report? But in his report, he didn't say that when he was recalled to impeach, effectively impeach, Lucy Carbolito's testimony, that she never told him about the gun. When he was recalled for that, and they asked him, the state asked him, did they tell you, or did Lucy tell you that a defendant in Perez went to Chicago, or did Lucy tell you that defendant in Perez went to Chicago to get a gun? And after looking at his report, he said, I don't know. That was before the jury. When he was recalled, he said he didn't know. And then the state argued in closing argument, didn't they, that the defendant told Lucy about the gun? Right, and to the extent... So they argued that it was substantive evidence of his knowledge of the gun, correct? Correct. The discovery violation is compounded by the evidentiary error. The state should never have been allowed to try to perfect impeachment of that statement. Do you agree? Because Lucy was the state's witness? She was not, she didn't observe, she was not impeached on something that she observed. It was not a recorded statement. It was just an oral statement about, that's inconsistent with something that she said on direct, and it's not something that she observed. Is that proper impeachment? Notwithstanding the discovery violation, the state should never have been allowed to perfect the impeachment. Well, that wasn't discussed here, Your Honor. I really don't know. It's all generated from the same error. Dempsey doesn't put this statement in his report, correct? It's unclear from the report. He can't say once he's recalled. Is it not in the report that Lucy said the statement that the defendant made about the gun? It's in the report, but it's ambiguous. So what's the report say? It says they went to Chicago to get a gun. But when he was asked, they went to Chicago, I believe is what it was. They went to Chicago. They went to Chicago to get a gun. And now the officer is asked on cross-examination, where's this statement come from? And he says it's from his notes, correct? Correct. And you agree that under 114 S 13, the statute, that statute was put into effect to ensure that all material, including notes, are turned over to the state. Right, correct. In homicide cases. Yes. So after Dempsey gets off the stand, does he go back, look at his notes and correct the error? No. And you agree to get an affirmative obligation to do so. And the state's attorney had an affirmative obligation to check and see whether or not that testimony is contained within the notes. You agree with that? I agree with that. And at the third stage hearing, as I said, they did admit that it was a discovery violation. How can we say that that error did not contribute to the defendant's, to the guilty verdict? Because even with, even absent the gun, even, even if we didn't. Absent the gun, you have common design. Right. Did you argue common design in the trial court? Was there a common design instruction for the jury? I don't believe so. I don't recall. I don't believe so. But we can affirm on any basis in the record. But again, right, since that was not argued to the jury, then that's a different story. Well, what basis is in the record if there was no jury instruction? There was no instruction for the jury. And there was no, not even an argument of common design. How would that record reflect a basis to affirm? Right. That's a rhetorical question. Um, but again, I think. Depending on what Justice Burkett said, it seems as what the state did when they said that Lucy and her admission, if you want to call it that, based upon an impeachment by Officer Dempsey was used not just as impeachment, but as substantive evidence to establish that the defendant had knowledge that there was not only a common design, but a common design with a gun. And as Justice Burkett says, how is it that this impeachment was being used by the state as substantive evidence? Forget the discovery violations and all that. How is it that the state was allowed to use this Dempsey impeachment as substantive evidence? Because it did. It argued that the jury should consider it to establish criminality instead of establishing that she doesn't know what she's talking about. It argued it in closing arguments. Is that what you're saying? Okay, well, the jury is instructed that closing argument is not evidence. With an error like this, you really think the jury parsed out that nuance of what is proper and not proper impeachment when the trial court allows the impeachment to take place? We have to presume that the jury did whether the jury did or not. Is the jury even admonished as to the differences between substantive and impeachment evidence and the purposes upon which it is supposed to deliberate and consider it? Was there a general instruction somewhere? And if there was, were they instructed at the time that this was impeachment evidence and not substantive evidence so that they would know that that was the standard they should apply? There was an objection. And was it sustained? It was not sustained, which is obviously what I hear. When a trial court overrules an objection, it reaffirms the prosecutor's argument, correct? Yes. The jury was led to believe that the defendant admitted to his own sister that he had a gun or what he knew about the gun, which corroborated his statement to the police. Your Honor, I disagree with that simply because when Detective Dempsey was called, he said, I don't know if she said. I don't know if she said that her brother went to Chicago to drive Perez or if her brother went to Chicago to drive Perez and get a gun. So I disagree that the jury was led to believe. Well, neither one of those were in his notes. Nothing about the trip to Chicago was in his notes. Nothing about the trip to Chicago was in his notes. Right. And if that statement had actually been made, wouldn't it be reasonable inference that a police officer in a homicide investigation would have documented that statement? These are field notes that are made for purposes of writing a report later on. Police officers who I assume had some training, you know, to document any and all statements of the accused, whether they're to law enforcement or to some stranger on the street or to a family member. You document it. There's no documentation of any sort of statement about the trip to Chicago from Lucy, correct? As far as I could decipher from the notes, there wasn't. But again, the notes were at best cryptic. They were indecipherable. I could not read the notes. I don't know if your honors were able to make anything of the notes. Again, I presume that is why the reports are prepared. And the report was brought out at trial. He was confronted with the report, and he said, honestly, I don't know what she said. Do you remember Humpty Dumpty in Alice in Wonderland? I do. He said, I use a word any way I want, and the more I use it the way I want, the more valuable the word is. And so a word can mean anything he wants. And in this instance, it seems that Officer Dempsey's notes mean anything he wants them to mean. Because if you can't decipher them, then you don't know whether or not he's right or wrong when he claims that his notes say this or that. The purpose of the rule, the law, is to see to it that people like you and the court and the prosecutor and everybody else reads notes and is able to understand, comprehend, and narrowly define what it is that are in the notes. And if you can't understand what those notes say, those notes are worthless. But if they're used to corroborate a statement that substantiates the claim against the defendant, as someone said, this is built out of less than whole cloth. Do you want to respond? First of all, I don't think that the notes are worthless just because I can't decipher them. When I write something, people in my office can't decipher anything that I write. I don't think it's worthless. That's why I then type it out. I think that's why once a police officer prepares his notes and prepares a report... So when you said that, you were talking about you couldn't read the person's handwriting rather than you couldn't decipher what the words meant. Correct. So, yes, that's what I meant. I couldn't read, but I don't think they're worthless just because I can't read them. I think that's why he or that's why police officers then go and prepare a report. And he was confronted with that report. That information was before the jury. He said, I don't know what she told me. The jury knew that he was unsure. So I don't know how those notes would have been material. Okay, he would have looked at the notes and said, okay, I don't know. We don't know what he would have said. Julie, what you're arguing is there was no harm, no foul because what he said was unsure. Even though the state argued that it wasn't that he was unsure, he clearly established through improper impeachment substantively that the defendant admitted to his sister that he was aware that there was a gun in the car when they went to the apartment complex. Did he say that? And when asked specifically, his response was, I didn't know or I don't know. And so all this house of cards, which, as someone on this panel has said, is very incriminating, is based upon a closing comment, which is, I don't know. Well, okay. I'm trying to understand what you're saying. I'm saying that you're trying to diminish this by suggesting that in the end, we're supposed to assume that it means virtually nothing, that it's not relevant, material or probative because of this one statement that he says that I don't know. Despite the fact that the state presented to the jury substantive evidence that shouldn't have presented as substantive evidence, that Lucy was told by the defendant that he knew there was a gun in the car and then after having that presented to the jury argue, hey, it's a mere bag of shells because, well, we're going to look at this one statement in isolation and say, he said I didn't know. There were no objections to those statements, though. There was objection. Does that compound the problem, though? I don't understand. What do you mean? Well, this is an ineffective assistance of counsel. It's the argument here. Right. But counsel did not raise that in his brief. He raised a discovery violation. It's all promised on the same piece of evidence or lack thereof. There was no statement by Lucy anywhere in any document that referenced a trip to Chicago or a gun. Correct? Correct. And they did raise that issue. They did raise that issue. That was the linchpin of the accountability theory was the defendant's knowledge of a gun in the car. Correct. And I think that the defendant's knowledge of the gun in the car could have come from somewhere else other than Lucy's. It could have been inferred. It could have been inferred from the circumstances surrounding. That's a much different issue. And Salazar is a case that I've mentioned. Counsel is very similar. We follow Fernandez. But that common design argument was not made to the jury. The jury was instructed on accountability, traditional accountability, that he had knowledge. And I think the jury could have inferred that he had knowledge from the fact that he drove him to Chicago, that he had a prior incident the day before. Although I don't think he testified about the prior incident. But he drove Perez to Chicago. He drove Perez to the apartment. In the statement to the police, was there any corroboration for the incident the day before? Did Lucy testify that there had been a confrontation the day before? No. She testified that the defendant had told her. Well, no, there was. She testified that the defendant actually testified about the incident the day before. And he said he was scared and he told Lucy not to leave the house. And then the next day, he went to a place where he knew his gangster's disciples' territory after he had driven the shooter to Chicago. And then back. So I think that even without this Detective Dempsey and the discovery violation, there was enough to show under the traditional accountability theory that defendant had knowledge of the gun. So if your honors have no further questions, we ask you to affirm. Thank you. Thank you. Mr. Branstreet. I have a comment to what was just discussed. And I just want to make it clear that nowhere in the third state hearing argument did Mr. DeRue, the state's attorney, take the position that those notes that were finally delivered on the last day, years after this trial, in any way, shape, or form supported Detective Dempsey's testimony. He did not take that position because it's not there. Nothing. Was there any explanation as to the time delay that it took? Did Dempsey lose the notes? Was he hospitalized or was there some problem? I commend Mr. DeRue. Judge, he did everything he could. He called. He went over this for months before the third state hearing. And DeRue always had some kind of excuse why he couldn't get them to him. But he finally did. It was like 30 pages. They're readable. They just don't say what he says they say. Thank you very much. Thank you. We'll take the case under advisement. If there are other cases on the call, there will be a short recess.